## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## TAMPA DIVISION

WENDY and NICHOLAS GRASSO,
on behalf of themselves and all others
Similarly situated,

                          Plaintiffs,

v.

ELECTROLUX HOME PRODUCTS, INC.

                          Defendant.

Case No.: 8:16-cv-00911-CEH-TGW

CLASS ACTION

## PLAINTIFFS' UNOPPOSED MOTION FOR FINAL APPROVAL OF CLASS ACTION SETTLEMENT AND INCORPORAED MEMORANDUM OF LAW IN SUPPORT

Pursuant to Federal Rule of Civil Procedure 23(e), Plaintiffs, Wendy and Nicholas Grasso ("Plaintiffs" or "Class Representatives"), hereby move the Court for the entry of an order granting final approval of the proposed class action settlement ("Settlement") reached in this case. The Settlement will resolve this litigation and the ongoing related case, *Robert Brown v. Electrolux Home Products, Inc.*, No. 1:08-cv-00030-LGW-BKE, pending in the Southern District of Georgia (Augusta Division). This motion is based on the points and authorities cited in the incorporated Memorandum of Law in Support, the Declarations of R. Brent Irby previously submitted (Docs. 199-3 ("Irby Prelim. Decl."), 216-1 ("Irby Fee Decl."), the Declaration of Steve Weisbrot attached hereto, Plaintiffs' Unopposed Motion of Attorneys' Fees, Expenses, and Class Representative Service Awards (Doc. 216), Memorandum of Law in Support of the same, the arguments of counsel, the Settlement Agreement, and all files, records, and proceedings in this action, including Plaintiffs' Unopposed Motion for Preliminary Approval of Class Action

Settlement (Doc. 199) and all material submitted in support thereof. Defendant Electrolux Home Products, Inc. ("Defendant" or "Electrolux") does not oppose this motion.

## I. INTRODUCTION

On November 14, 2017, this Court entered an order preliminarily approving the Class Action Settlement between Plaintiffs[1] and Defendant, Electrolux Home Products, Inc., which preliminarily approved the Settlement Agreement[2] and certified the following class for settlement purposes: all individual consumers who, between January 1, 2004, and December 31, 2011, purchased a "Class Washer" in the United States. (Doc. 208 at 4.)  In doing so, the Court preliminarily determined that the Settlement – a product of hard-fought, arms-length negotiations informed by nearly a decade of contentious litigation – was "fair, reasonable, and adequate." (*Id.* at 7.)

In light of the overwhelmingly favorable reaction of the Class, the benefits made available by the Settlement, and in order to avoid the burden, expense, inconvenience, and uncertainty of continued litigation, Plaintiffs now ask the Court to grant final approval to the Settlement. It is in the best interest of the Class to resolve and settle this litigation. Tellingly, although over 750,000 Class Members were provided notice of the Settlement by direct-mail and with the Class also notified by means of approved publication and internet notices, only fifteen (15) objections have been filed and only 137

---

[1] Plaintiffs include Nicholas and Wendy Grasso and also named Plaintiff in the class action pending in the Southern District of Georgia, Robert Brown (collectively "Plaintiffs").

[2] The Settlement Agreement is attached as Exhibit 1 to Plaintiffs' preliminary approval papers, which was previously filed with the Court. (Doc. 199-1.) Unless otherwise noted, all terms herein have the same meaning as set forth in the Settlement Agreement.

people have opted out of the Settlement.[3] Accordingly, this Court should grant final approval to the Settlement and direct that the benefits be provided to the Class.

## II. BACKGROUND

### A. Summary of Plaintiffs' Allegations and Claims.

In this case and in the related case pending in the Southern District of Georgia, Plaintiffs allege that certain Electrolux-manufactured high-efficiency front-loading washers ("FLWs") contain a design defect that results in the washers having a propensity to accumulate bacteria, resulting in mold, mildew and odor issues and damage to garments and other fabrics. (*See Grasso* Doc. 195; *Brown* Doc. 61-2.) Plaintiffs contend that these mold, mildew and odor issues cause nauseous odors and ruin laundry in the course of the washer's ordinary use.

Plaintiffs assert claims against Electrolux for breach of express and implied warranties, violations of state consumer protection statutes, violations of the Magnuson Moss Warranty Act, 15 U.S.C. §2301, *et seq.*, negligent design and unjust enrichment. (*See Grasso* Doc. 195.) These claims all relate to the allegation that the Class Washers are defective because they had an undisclosed propensity to accumulate bacteria and mold, thus resulting in mold, mildew and odor issues within the washer. (*See id.*) Defendant contests these allegations in both actions.

Plaintiffs do not allege any claims for personal injury or emotional distress.

### B. History of the Electrolux Litigation.

As stated, the proposed Settlement Agreement conclusively resolves two (2) pending class actions against Electrolux involving mold, mildew and Odor Issues (as that

---

[3] The deadline for opt-outs and objections was February 20, 2018.

term is defined in the Settlement Agreement) with Electrolux-manufactured FLWs: *Robert Brown v. Electrolux Home Products, Inc. d/b/a Frigidaire*, No.: 1:08-cv-00030-LGW-BKE (S.D. Ga.) (hereafter the "*Brown* case") and *Wendy and Nicholas Grasso v. Electrolux Home Products, Inc.*, No.: 8:16-cv-00911-CEH-TGW (M.D. Fla.) (hereafter the "*Grasso* case").

### 1.    The *Brown* Case.

On March 5, 2008, Michael Terrell filed a putative nationwide class action against Electrolux in the United States District Court for the Southern District of Georgia, Augusta Division (Case No.: 1:08-cv-030), alleging that certain of Electrolux's front-load washing machines contained a design defect that causes them to accumulate mold and mildew which stains laundry, gives off foul odors, and causes the washers to fail of their essential purpose. (See *Brown* Doc. 1.) Additional Plaintiffs, including Robert Brown and Michael Vogler, were subsequently added as class representatives on behalf of state-based subclasses. (*See Brown* Doc. 66.)

Electrolux moved to dismiss the amended complaint and to strike its class allegations. (*Brown* Docs. 35, 43, 80, 87.) These motions were granted in part and denied in part, with the nationwide, but not state-based, class allegations being stricken. (*Brown* Doc. 124.) Thereafter, the parties engaged in extensive discovery.

In July 2011, Plaintiffs Brown and Vogler filed a Renewed[4] Motion for Class Certification on behalf of consumers in California and Texas. (*Brown* Doc. 158.) The district court granted this motion by Order dated October 11, 2013. (*Brown* Doc. 201.)

---

[4] A prior Motion for Class Certification filed by Plaintiffs was denied without prejudice for lack of proof of numerosity. (*Brown* Doc. 124.)

Electrolux subsequently applied for permission to appeal the class certification order pursuant to Fed. R. Civ. P. 23(f). Its application was granted on April 7, 2015. Thereafter, the parties briefed the appeal and argued the case orally.

Upon remand, the parties filed supplemental briefs addressing the issues raised by the Eleventh Circuit. (*Brown* Doc. 219-221.) Following its receipt and review of the parties' supplemental briefs, the district court denied the Plaintiffs' renewed motion for class certification without prejudice and re-opened discovery for sixty (60) days in order to allow the parties to conduct discovery concerning the likelihood that the defect alleged by the Plaintiffs would manifest throughout the class over the useful life of the washers. (*Brown* Doc. 224.) Thereafter, the parties engaged in intensive discovery on this issue. This discovery included the retention of experts, the inspection of Mr. Brown's and Mr. Vogler's washers, the examination of documents relating to the washers' design, and the deposition of relevant experts.

On April 24, 2017, Electrolux filed *Daubert* motions seeking to exclude Plaintiffs' experts from offering testimony on the likelihood that the defect would manifest throughout the class. (*Brown* Docs. 235, 238.) These motions were granted on July 10, 2017, (*Brown* Doc. 235), and Plaintiffs' experts were disqualified from offering expert testimony on the manifestation issue.

### 2. The *Grasso* Case.

On January 2, 2015, Wendy and Nicholas Grasso filed a putative class action in the Circuit Court of Miami-Dade County, Florida. The Grassos filed their case on behalf of all Florida residents that own certain models of Electrolux-manufactured FLWs. Like the plaintiffs in the *Brown* case, the Grassos alleged that an inherent defect within their

5

washing machine caused mold, mildew, and/or biofilm accumulation in their machine. Electrolux removed the case to the Southern District of Florida (*Grasso* Doc. 1) and thereafter moved to dismiss Plaintiffs' Complaint (*Grasso* Doc. 7). That motion was subsequently denied. (*Grasso* Doc. 21.)

Following the denial of its Motion to Dismiss, Electrolux filed a Motion for Reconsideration (*Grasso* Doc. 27) and a Motion to Change Venue (*Grasso* Doc. 28). The parties briefed both motions, and the Court ultimately denied Electrolux's request for reconsideration (Grasso Doc. 44) but granted the request to transfer. (*Grasso* Doc. 47.)

The case was transferred to this Court on April 15, 2016. (*Grasso* Doc. 49.) Throughout the next several months, the parties vigorously conducted class discovery. This phase involved the review and production of thousands of documents, multiple rounds of written discovery, and inspections of the Grassos' washing machines. Additionally, the parties exchanged eleven (11) expert reports and conducted over ten (10) depositions between them.

On December 5, 2016, Plaintiffs filed their Motion for Class Certification. (*Grasso* Doc. 114.) Electrolux opposed that motion (*Grasso* Doc. 125), and filed multiple *Daubert* motions (*Grasso* Docs. 118-123) and a Motion for Summary Judgment. (*Grasso* Doc. 117.) Following extensive motion practice on class certification, *Daubert*, and summary judgment issues, the Court held a hearing on April 5, 2017 on all pending motions. The motions were taken under advisement (*Grasso* Doc. 177.) The Court also granted Plaintiffs leave to conduct limited discovery on the issue of whether an extended warranty purchased by the Grassos would have covered the alleged defect in their washing machine. (*Grasso* Docs. 178-179.) Plaintiffs completed this discovery and filed

a supplemental summary judgment opposition on May 5, 2017 (*Grasso* Doc. 186), which

Electrolux responded to on May 19, 2016.  (*Grasso* Doc. 187.)  The parties reached this

settlement after oral argument, but before the Court issued a ruling on the aforementioned

motions.

      **C.**    **Discovery.**

     Discovery in this litigation has been extensive and contentious.  Plaintiffs served

multiple sets of document requests, interrogatories, and request for admissions.  (Irby

Prelim Decl. at ¶4.)  Electrolux produced, and counsel for Plaintiffs reviewed and

catalogued, over 100,000 pages of documents, including materials regarding the design

and marketing of the washers.  (*Id*.)  Plaintiffs' counsel deposed key Electrolux

personnel, and Electrolux deposed and inspected the washing machines of the class

representatives in the Georgia and Florida cases.  (*Id*.)

     Expert discovery was equally comprehensive.  Between them, the parties

employed more than ten (10) testifying experts and expert reports, nearly all of whom

were subject to depositions, some on more than one occasion.  (*Id*. at ¶5.)  The experts

prepared reports related to, among other things, the washers' allegedly defective design,

mold growth and testing, consumer perception, and damages.  (*Id*.)

     Between this all-encompassing discovery, appellate briefing, and briefing on class

certification and summary judgment, the parties could hardly have contested this matter

more vigorously, nor done more to understand the relative strengths and weaknesses of

their respective positions over the nine (9) year course of this litigation.  (*Id*. at ¶6.)

**D.**     **Settlement Negotiations.**

In late 2016, the parties began exploring the potential for resolution of the ongoing Electrolux litigation on a class-wide basis. (*Id.* at ¶7.) These discussions were prompted by the parties' desire to avoid the expense, uncertainties, and burden of protracted litigation, and to put to rest any and all claims for causes of action that have been, or could have been, asserted against Electrolux arising out of the allegedly defective FLWs. (*Id.*)

For months throughout 2017, the parties exchanged offers and counter-offers, and negotiated the points of each vigorously. (*Id.* at ¶8.) Counsel for Plaintiffs and Electrolux conducted multiple settlement conferences and exchanged numerous proposals throughout this process. (*Id.*) By June, 2017, the parties had reached an agreement in principle on certain important components related to the potential settlement, and hence executed a written term sheet outlining those material terms agreed to in principle. (*Id.*) As a result of those negotiations, the parties reached an agreement on the material terms of substantive relief for the settlement class. (*Id.*)

After the parties reached an agreement-in-principle on all material terms of substantive relief to the Settlement Class, they began negotiating the amount of attorneys' fees and costs that Electrolux would pay to Class Counsel (subject to Court approval) and the amount of service awards Electrolux would pay to the class representatives (also subject to Court approval). (*Id.* at ¶9.) At all times, the issue of attorneys' fees and costs and class service awards was negotiated separately from, and in addition to, the settlement relief to class members. (*Id.*) Following negotiations, the parties reached agreement-in-principle on those issues on June 13, 2017. (*Id.*)

At all times, the parties' negotiations on all terms were adversarial, non-collusive, and conducted at arms-length. (*Id*. at ¶10.) During their negotiations, the parties had the benefit of other prior nationwide class settlements with other front-load washer manufacturers resolving similar claims, all of which were met favorably by consumers and the settlement courts. (*Id*.) The largest of these prior nationwide settlements involving similar front-load washer litigation was *In re: Whirlpool Corp. Front-Loading Washer Products Liability Litigation*, No.: 08-wp-65000 (N.D. Ohio). The substantive relief for the settlement class available in this proposed Settlement Agreement is modeled largely in part on the substantive relief available in the *Whirlpool* nationwide class settlement. (*Id*.)

**E.**   **Terms of the Settlement.**

The Settlement provides substantial economic benefits to the Class. Class members who actually experienced a mold, mildew, and/or Odor Issue may elect between (i) a $50 cash payment; (ii) a 20% cash rebate off of the retail purchase price of any Electrolux-manufactured appliance contained on a comprehensive Appliance Options List; or (iii) if the class member incurred documented out-of-pocket expenses within five (5) years of purchase to service or replace their class washer due to mold, mildew, and/or Odor Issues, reimbursement of up to $500, including up to $150 for damaged garments or fabrics. (Settlement Agreement at ¶¶2.2, 2.5.) The rebate eligible appliances contained on the Appliance Options List is extensive and includes over 275 rebate eligible appliances.

All other class members, i.e., those who purchased or acquired a new Class Washer but did not experience a mold, mildew, and/or Odor Issue within five (5) years of

purchase, will be eligible to receive a 5% cash rebate off the retail price of an Electrolux-manufactured appliance contained on the comprehensive Appliance Options List.  (*Id.* at ¶2.4.)  The rebates available to both the mold and non-mold class members are valid for one-year and are transferrable to an immediate family member.  (*Id.* at ¶3.1.)

Additionally, Electrolux has also agreed to pay for the reasonable cost of notice and claims administration, and a $4,000 service award in the aggregate to the Grasso plaintiffs and $4,000 to the Brown plaintiff, who are the class representatives in the Settlement.  (*Id.* at ¶¶5.3, 16.1.)  In a previously filed motion, Class Counsel has sought an award of (and Electrolux agrees not to oppose) up to $3,300,000 for attorneys' fees, and up to $400,000 for reimbursement of litigation expenses and costs incurred, all subject to Court approval.  (Doc. 219; Settlement Agreement at ¶15.2.)  That amount represents a significant discount to the actual time expended by the class counsel litigating these cases, which is more than 11,000 hours and $5.25 million in total lodestar.  (Irby Prelim. Decl. at ¶11; Irby Fee Decl. at ¶27.)  If approved by the Court, Electrolux will separately pay these fees, costs, expenses and service awards.  (Irby Prelim Decl. at ¶11.)  These amounts will not reduce the amount of benefits available to class members.  (*Id.*)

Any class member who, based on Electrolux's service call and warranty records, previously made a complaint to Electrolux about mold, mildew, and/or Odor Issues with his class washer within five (5) years of purchase is considered a pre-qualified class member.  (Settlement Agreement at ¶1.20.)  Pre-qualified class members only are required to confirm their names, addresses, and email addresses, check several eligibility boxes on the claim form, and e-sign the claim form.  (*See* Claim Form, attached to

Settlement Agreement as Exhibit B-2.)   Non-prequalified class members also have a straight-forward claim form; in addition to the information provided by pre-qualified class members, they need only provide a photograph of the class washer's serial and model numbers or some other proof of purchase, as well as an attestation under oath that they have experienced a mold, mildew, and/or Odor Issue with the class washer within five (5) years of purchase.   (*See* Claim Form, attached to Settlement Agreement as Exhibit B-1.)   Class members have until April 19, 2018 to submit their claims. (Settlement Agreement at ¶3.8.)

### F.      Preliminary Approval and Class Notice.

On November 14, 2017, the Court granted preliminary approval to the proposed Settlement.  (Doc. 208.)  Pursuant to the Court's Order, Angeion disseminated a copy of the Notice to Settlement Class Members in accordance with the plan for Notice, which this Court found to be the "best notice practicable under the circumstances," and consistent with the requirements of due process.  (Docs. 208 at 9, 215.)  The Declaration of Steven Weisbrot ("Weisbrot Decl."), filed concurrently herewith, discusses in detail the implementation of this Notice Plan and dissemination of the Class Notice.  As of March 15, 2018, the dedicated toll-free number Angeion set up to field calls from Class Members had received over 10,000 calls (Weisbrot Decl. at ¶15) and 27,910 claims for benefits have been submitted by Class Members.  Claims will continue to be submitted through the April 19, 2018 claims deadline.  (*Id.* at ¶17.)  As already noted, only fifteen (15) objections were filed and only 137 Settlement Class Members opted-out of the Settlement.  (*Id.* at 18.)

### III. <u>ARGUMENT</u>

**A.    <u>The Settlement Is Fair, Reasonable, And Adequate, And Should Be Approved.</u>**

"Settlement of complex cases contribute greatly to the efficient utilization of scarce judicial resources, and achieve the speedy resolution of justice." *Wilson v. EverBank*, No. 14—CIV-22264, 2016 WL 457011, at *6 (S.D. Fla. Feb. 3, 2016). "For these reasons, 'there exists an overriding public interest in favor of settlement, particularly in class actions that have the well-deserved reputation as being most complex." *Id.* (quoting *Lipuma v. Am. Express Co.*, 406 F. Supp. 2d 1298, 114 (S.D. Fla. 2005)). "Settlement agreements are highly favored in the law and will be upheld whenever possible because they are a means of amicably resolving doubts and uncertainties and preventing lawsuits." *Pierre-Val v. Buccaneers Ltd. Partn.*, No. 8:14-CV-01182, 2015 WL 3776918, at *1 (M.D. Fla. June 17, 2015) (quoting *In re Nissan Motor Corp. Antitrust Litig.*, 552 F.2d 1088, 1105 (5th Cir. 1977).

In deciding whether to approve the Settlement, the Court will analyze whether it is "fair, adequate, reasonable, and not the product of collusion." *Leverso v. Lieberman*, 18 F.3d 1527, 1530 (11th Cir. 1994); *see also Bennett v. Behring Corp.*, 737 F.2d 982, 986 (11th Cir. 1984). The Court's "judgment is informed by the strong judicial policy favoring settlement as well as by the realization that compromise is the essence of settlement." *Wilson*, 2016 WL 457011, at *6, quoting *Nelson v. Mead Johnson & Johnson Co.*, 484 Fed. App'x 429, 434 (11th Cir. 2012) (quoting *Bennett*, 737 F.2d at 986).

The Eleventh Circuit has identified six (6) factors to be considered in analyzing the fairness, reasonableness and adequacy of a class settlement under Rule 23(e):

(1)     the existence of fraud or collusion behind the settlement;

(2)     the complexity, expense, and likely duration of the litigation;

(3)     the stage of the proceedings and the amount of discovery completed;

(4)     the probability of the Class Representative's success on the merits;

(5)     the range of possible recovery; and

(6)     the opinions of the class counsel, class representative, and the substance
        and amount of opposition to the settlement.

*Montoya v. PNC Bank, N.A.*, No. 14-20474, 2016 WL 1529902 at \*8 (S.D. Fla. April 13,

2016), citing *Leverso*, 18 F.3d at 1530 n.6; *Bennett*, 737 F.2d at 986.   The analysis of

these factors, set forth below, shows this Settlement to be eminently fair, adequate, and

reasonable.

> **1.     The Settlement Is the Product of Good Faith, Informed and
> Arm's Length Negotiations Among Experienced Counsel, and
> Was Not the Product of Fraud or Collusion.**

The first factor for final approval requires the Court to consider whether the

Settlement was obtained by fraud or collusion among the parties and their counsel.

Courts begin with a presumption of good faith in the negotiating process.   "Where the

parties have negotiated at arm's length, the Court should find that the settlement is not the

product of collusion."  *Wilson*, 2016 WL 457011, at \*6, quoting *Saccoccio*, 297 F.R.D.

683, 692 (S.D. Fla. 2014) (citing *Ass'n for Disabled Ams., Inc. v. Amoco Oil Co.*, 211

F.R.D. 457, 470 (S.D. Fla. 2002)).   In such cases, "[t]here is a presumption of good faith

in the negotiation process." *Id.*

Here, the Settlement was the result of intensive, arms-length negotiations between

experienced attorneys who are familiar with class action litigation and with the legal and

factual issues involved in front-load washer cases.  The Settlement was reached only after

numerous negotiations over the course of several months.  (Irby Decl. at ¶8.)  *See, e.g., Blessing v. Sirius XM Radio, Inc.*, 507 F. App'x. 1, 3 (2nd Cir. 2012) (finding that "the district court did not abuse its discretion when it presumed the proposed settlement was fair" where "competent counsel appears on both sides" and "settlement was reached only after contentious negotiations"); *Enter. Energy Corp. v. Columbia Gas Transmission Corp.*, 137 F.R.D. 240, 244 (S.D. Ohio 1991) (approving settlement reached "after almost six months of concerted negotiations").

Additionally, the proposed Settlement was reached only after nearly a decade of hard-fought, no-holds-barred litigation, including extensive briefing on class certification, summary judgment, *Daubert* expert issues, and appellate practice concerning class certification.  (Irby Decl. at ¶6.)  The parties conducted discovery on all relevant issues, exchanging more than 100,000 documents and taking numerous fact and expert depositions.  (*Id.* at ¶¶4-5.)  Numerous procedural and substantive motions also were briefed and argued by the parties throughout the litigation.     In short, the parties could hardly have litigated these cases more vigorously, or done more to understand the issues in the case or tested their theories and defenses.  (*Id.*)  *See* 4 NEWBERG ON CLASS ACTIONS, §13:14 ("Where the proposed settlement was preceded by a lengthy period of adversarial litigation involving substantial discovery, a court is likely to conclude that the settlement negotiations occurred at arms-length.").

There is no doubt this Settlement was at all times arms-length, and it therefore carries a presumption of fairness.  Where there "is no evidence of any kind that the parties or their counsel have colluded or otherwise acted in bad faith in arriving at the terms of the proposed settlement . . . counsel's informed recommendation of the

agreement is persuasive that approval is appropriate." *Strube v. Am. Equity Inv. Life Ins. Co.*, 226 F.R.D. 633, 703 (M.D. Fla. 2005). And here, Class Counsel are in favor of this proposed settlement and recommend it. (Irby Prelim. Decl. at ¶14.)

## 2.   The Complexity, Expense, and Duration of Further Litigation Supports Approval of the Settlement.

The claims and defenses in this case are complex and vigorously contested. Continued litigation will involve substantial delay and expense, which further counsels in favor of final approval. Complex litigation – like the instant case – "can occupy a court's docket for years on end, depleting the resources of the parties and the taxpayers while rendering meaningful relief increasingly elusive." *Wilson*, 2016 WL 457011, at *7, quoting *In re U.S. Oil & Gas Litig.*, 967 F.2d 489, 493 (11th Cir. 1992); *In re Domestic Air Transp. Antitrust Litig.*, 148 F.R.D. 297, 317, 325-26 & n.32 (N.D. Ga. 1993) ("[A]djudication of the claims of two million claimants could last half a millennium"). As a result, recovery by any means other than settlement will undoubtedly require additional complex, protracted and expensive litigation.

In addition, in evaluating this factor, "[t]he court should consider the vagaries of litigation and compare the significance of immediate recovery by way of the compromise to the mere possibility of relief in the future, after protracted and expensive litigation. In this respect, '[i]t has been held proper to take the bird in the hand instead of a prospective block in the bush.'" *Lipuma,* 406 F. Supp. 2d at 1323 (quoting *In re Shell Oil Refinery*, 155 F.R.D. 552, 560 (E.D. La. 1993). Because the "demand for time on the existing judicial system must be evaluated in determining the reasonableness of the settlement," *Ressler v. Jacobson*, 822 F. Supp. 1551, 1554 (M.D. Fla. 1992), there can be no doubt about the adequacy of the present Settlement, which provides meaningful benefits to the

Class.  Considering the uncertainties inherent in continued litigation, including trial and an appeal in the litigation, along with the delays and complexities inherent in this type of litigation, settlement is in the best interest of Plaintiffs and the Class.  *Lipuma*, 406 F. Supp. 2d at 1324.

### 3. The Factual Record Was Sufficiently Developed to Enable Class Counsel to Make a Reasoned Judgment.

The stage of proceedings at which settlement is reached is "evaluated to ensure that Plaintiffs had access to sufficient information to adequately evaluate the merits of the case and weigh the benefits of settlement against further litigation."  *Wilson*, 2016 WL 457011, at *7, (quoting *Lipuma*, 406 F. Supp. 2d at 1324 (citation omitted)).

As stated, the settlement resulted from arms-length negotiations informed by over nine (9) years of aggressive and comprehensive litigation.  During the course of this litigation, more than 100,000 pages of documents have been produced and reviewed, dozens of fact and expert depositions have been conducted, numerous expert reports have been prepared, and dozens of major motions have been filed.  Additionally, the parties briefed summary judgment and class certification before this Court.  (Irby Prelim. Decl. at ¶6.)  Between this all-encompassing discovery and extensive briefing on procedural and substantive matters, the parties could hardly have contested this matter more vigorously, nor done more to understand the relative strengths and weaknesses of their respective positions over the nine (9) year course of this litigation.  (*Id.*)

Simply put, this matter has been vigorously litigated for many years and, thus, there was no shortage of information and no rush to settlement here.  This Settlement was reached after both sides endured the rigors of hard-fought motion practice, discovery and litigation.

4.    **The Likelihood of Success at Trial Supports Approval of the Settlement.**

"By far the most important factor in evaluating the fairness and adequacy of a settlement is the likelihood and extent of any recovery from the defendants absent the settlement." *In re Domestic Air Transp. Antitrust Litig.*, 148 F.R.D. at 314; *see also Ressler*, 822 F.Supp. at 1555 ("A Court is to consider the likelihood of the plaintiff's success on the merits of his claims against the amount and form of relief offered in the settlement before judging the fairness of the compromise.").

The Settlement here is compelling given the substantial litigation risks the settlement class faced. Electrolux's summary judgment motion filed in this Court sought to eliminate the claims of a significant subset of the proposed class. (*See Grasso* Doc. 117.)    Likewise, Electrolux has asserted significant *Daubert* challenges to Plaintiffs' experts which remain pending. (*See Grasso* Docs. 118, 120-123.)    Further, the defense verdict in the *Whirlpool* front-load washing litigation further underscores the inherent uncertainty in any trial.   The value of any judgment would therefore be discounted by the delay the class members would suffer in actually obtaining a judgment.   By contrast, the proposed settlement provides certain, timely, and substantial relief. *Bennett*, 96 F.R.D. at 349-50 (plaintiffs faced a "myriad of factual and legal problems" that led to "great uncertainty as to the fact and the amount of damage," making it "unwise [for plaintiffs] to risk the substantial benefits which the settlement confer[red] … to the vagaries of a trial"), *aff'd*, 737 F.2d 982 (11th Cir. 1984).    Assessed against the delays and uncertainties associated with trial and appeals, the Settlement provides immediate, substantial economic benefits that are fair and reasonable.

17

**5.     The Benefits Provided by the Settlement are Fair, Adequate and Reasonable Compared to the Range of Possible Recovery.**

In determining whether a settlement is fair in light of the potential range of recovery, "the focus is on the possible recovery at trial." *Wilson*, 2016 WL 457011, at \*7 (quoting *Saccoccio*, 297 F.R.D. at 693). "[T]he fact that a proposed settlement amounts to only a fraction of the potential recovery does not mean the settlement is unfair or inadequate." *Behrens v. Wometco Enters., Inc.*, 118 F.R.D. 534, 542 (S.D. Fla. 1988), *aff'd*, 899 F.2d 21 (11th Cir. 1990). Indeed, "[a] settlement can be satisfying even if it amounts to a hundredth or even a thousandth of a single percent of the potential recovery." *Id.* This is because a settlement must be evaluated "in light of the attendant risks with litigation." *Thompson v. Metropolitan Life Ins. Co.*, 216 F.R.D. 55, 64 (S.D.N.Y. 2003); *see also Bennett*, 737 F.2d at 986 ("[C]ompromise is the essence of settlement."). Thus, courts regularly find settlements to be fair where "[p]laintiffs have not received the optimal relief." *Warren v. City of Tampa*, 693 F. Supp. 1051, 1059 (M.D. Fla. 1988); *see also, e.g., Great Neck Capital Appreciation Investment P'ship, L.P. v. PriceWaterHouseCoopers, L.L.P.*, 212 F.R.D. 400, 409-410 (E.D. Wis. 2002) ("The mere possibility that the class might receive more if the case were fully litigated is not a good reason for disapproving the settlement.").

As discussed at the preliminary approval hearing, the benefits available here compare favorably to what class members could recover if successful through trial. Specifically, at the class certification stage in this case, the Grassos submitted a damages expert that calculated two (2) measures of each class member's damages, both of which

essentially assessed damages based on diminution in value of the washer.[5] (*See* Doc. 114-5.) Under the expert's "willingness to pay" analysis (i.e., had the consumer known about all of the required maintenance due to the alleged defect), a per-washer damages calculation is $226. (*Id.* at 29.) Under the expert's "cost to cure" analysis (i.e., the loss in value to the machine because of parts and labor required to cure the alleged defect), the per-washer damages calculation is $245. (*Id.*)[6]

Accordingly, the value of the $50 cash payment for class members is equal to 22% of Plaintiffs' low-end damages estimate ($50/$226) and 20% of Plaintiffs' high-end damages estimate ($50/245). Obviously, these figures assume that Plaintiffs prevail at trial and a jury accepts Plaintiffs' damages testimony. And of course, Electrolux would claim that a consumer's alleged damages are much less or zero.

With respect to the 20% cash rebate off of any Electrolux appliance on the Appliance Option List, the value is even more significant. Again, the Appliance Option List is exhaustive and contains over 275 rebate-eligible appliances. (*See* Doc. 199-1 at Ex. D.) The average retail price of those different appliances on the Appliance Options List is approximately $1,134. Thus, it is fair to say that the 20% rebate has an average value of $226. For those class members electing the 20% cash rebate option, this amounts to 100% of Plaintiffs' low-end damages estimate ($226/$226) and 92% of Plaintiffs' high-end damages estimate ($226/$245).

---

[5]Despite the contentions by some objectors, Plaintiffs' damages have never been premised on the full price paid for a machine or machine's replacement value. (*See* Section II.B.1 herein.)

[6] These per-washer damages estimates conducted by Plaintiffs' expert are in line with the per-washer damages calculated by experts in other similar front-load washer cases.

For those class members opting to receive up to $500 in reimbursement for incurred out-of-pocket expenses to deal with the mold problem, they obviously can recover *more* than the maximum amount had the consumer prevailed after trial. These amounts are well within the range of settlements commonly approved by courts. *See In re Checking Account Overdraft Litig.*, 830 F.Supp.2d 1330, 1346 (S.D. Fla. 2011) (a recovery of between 9% and 45% was an "exemplary result"). Indeed, the Eleventh Circuit has affirmed claims-made settlements affording far less relief to class members than that afforded here. *See, e.g., Poertner v. Gillette Co.*, 618 Fed.Appx. 624 (11th Cir. 2015) *cert. denied sub norm. Frank v. Poertner*, No. 15-765, 2016 WL 1079040 (U.S. March 21, 2016) (unpublished) (affirming approval of claims-made settlement offering class members between six and twelve dollars for filing a claim); *Faught v. Am. Home Shield Corp.*, 668 F.3d 1233, 1238 (11th Cir. 2012) (upholding claims-made settlement that gave class members opportunity to resubmit warranty claims to the defendants through a procedure with enhanced consumer protections); *Nelson*, 484 Fed. Appx. at 432, 434-35 (upholding claims-made settlement where defendant agreed to send claimants free product up to a certain aggregate value).

These settlement benefits also compare favorably to the other front-load washer nationwide settlements that have been unanimously approved by other courts. The largest of these prior nationwide settlements involving similar front-load washer litigation was *In re: Whirlpool Corp. Front-Loading Washer Products Liability Litigation*, No. 08-wp-65000 (N.D. Ohio). The substantive relief for the settlement class available in the proposed Settlement Agreement here is modeled largely in part on the substantive relief available in the *Whirlpool* nationwide class settlement. In fact, Plaintiffs submit that the

substantive relief available for the settlement class here is superior to the class relief proposed and approved in the other front-load washer settlements, including *Whirlpool*.

Much like here, the substantive class relief approved in *Whirlpool* consisted of either a $50 cash payment, a 20% cash rebate off of the retail price of a new Whirlpool washer or dryer, or up to $500 in reimbursement of out-of-pocket expenses in addressing mold or odor problems. The *Whirlpool* settlement, like here, also provided a 5% cash rebate off the retail price of a new Whirlpool washer or dryer for class members unable to attest to having experienced a mold or mildew problem. However, unlike here, the rebate options available in the *Whirlpool* settlement applied only to Whirlpool-manufactured washers and dryers, or a washer and dryer combo. In contrast, here the rebate options apply to all Electrolux-manufactured appliances contained on the Appliance Options List, which contains over 275 rebate-eligible appliances beyond just washers and dryers. The extensive options here include ovens, electric and gas ranges, stainless steel refrigerators, freezers, dishwashers, and more.

Additionally, the class relief proposed here exceeds the class relief approved in the other front-load washer national class settlements. For example, in *In re: LG Front Loading Washing Machine Class Action Litig.*, No. 2:08-cv-00051-MCA-LDW (D.N.J.), the substantive class relief provided for a $35 cash payment or a rebate certificate worth $105 off of the retail price paid for a new LG brand front-load washing machine. The *LG* settlement did not provide relief for those consumers unable to attest to having experienced a mold or mildew problem, nor did it provide an option for reimbursement of out-of-pocket expenses. Likewise, the substantive class relief approved in *Tait, et al. v.*

*BSH Home Appliances Corp.*, No. 8:10-cv-00711 (C.D. Cal.) consisted only of an available $55 cash payment, with no option for reimbursement of out-of-pocket expenses.

Class Counsel assert that the Settlement benefits provided to Plaintiffs and Class Members through this Settlement present a very solid recovery, especially considering the strengths of the claims and the litigation risks described above.

> **6.    The Opinions of Class Counsel, Class Representatives, and Absent Settlement Class Members Favor Approval of the Settlement.**

In addition to the factors discussed above, the Court should give "great weight to the recommendations of counsel for the parties, given their considerable experience in this type of litigation." *Warren*, 693 F.Supp. at 1060; *see also Domestic Air*, 148 F.R.D. at 312-13 ("In determining whether to approve a proposed settlement, the Court is entitled to rely upon the judgment of the parties' experienced counsel. '[T]he trial judge, absent fraud, collusion, or the like, should be hesitant to substitute its own judgment for that of counsel.'") (citations omitted).

> This Court, like others, "considers the reaction of the class, as well as the reaction of the various state attorney generals and regulators, to the proposed settlement to be an important indicator as to its reasonableness and fairness." *Hall v. Bank of Am., N.A.*, No. 12-22700, 2014 WL 7184039, at *5 (S.D. Fla. Dec. 17, 2014). Obviously, "a low number of objections suggests that the settlement is reasonable, while a high number of objections would provide a basis for finding that the settlement was unreasonable." *Saccoccio v. JPMorgan Chase Bank, N.A.*, 297 F.R.D. 683, 694 (S.D. Fla. 2014); *see also Lipuma v. Am Express Co.*, 406 F.Supp. 2d 1298, 1324 (S.D. Fla. 2005).

*Howard Braynen, et al. v. Nationstar Mortgage, LLC, et al.*, 2015 WL 6872519 (S.D. Fla. 2015).

Here, Class Counsel wholeheartedly endorses the Settlement.  (Irby Prelim. Decl. at ¶14.)  Additionally, the reaction of the Settlement Class to the Settlement here has been

extremely positive. As evidenced by the attached declaration of Angeion Project Manager Steven Weisbrot, the reaction of the Class to the proposed Settlement is overwhelmingly positive, and supports final approval of the Settlement. (Weisbrot Decl. at ¶¶17-18.) The deadline established by the Court for objections and exclusions expired on February 20, 2018. (Doc. 208 at 14.) The Class was given an opportunity to review and object to the preliminary notice of the Settlement and Plaintiffs' application for attorneys' fees, costs, and expenses and service award to Class Representatives. Over 750,000 direct-mail notices were sent to Class Members, with the Class also notified by means of approved publication and internet notices. (Weisbrot Decl. at ¶¶5-13.) Here, only fifteen (15) Class Members filed objections and 137 Class Members opted out of the Settlement. This is a trivial fraction of the Class. Moreover, neither the United States Attorney General nor any other state attorney general objected to the Settlement despite being directly notified. These are powerful indicia that the Settlement is fair, reasonable, and adequate and deserves final approval. *See Hall v. Bank of America, N.A.*, No. 1:12-cv-22700, 2014 WL 7184039, at *5 (where objections from settlement class members "equates to less than .0016% of the class" and "not a single state attorney general or regulator submitted an objection," "such facts are overwhelming support for the settlement and evidence of its reasonableness and fairness"); *Hamilton v. SunTrust Mortg. Inc.,* No. 13-60749, 2014 WL 5419507, at *4 (S.D. Fla. Oct. 24, 2014) (where "not a single state attorney general or regulator submitted an objection," and there were few objections to the class settlement, "such facts are overwhelming support for the settlement").

**B.** **The Objections Are Without Merit And Should Be Overruled.**

As indicated above, although over 750,000 direct-mail notices were disseminated to class members, with class members also notified by means of approved publication and internet notices, the Court received and docketed only fifteen (15) unique objections. And these objectors face a high legal bar because "[o]nce preliminary approval has been granted, a class action settlement is presumptively reasonable, and an objecting class member must overcome a heavy burden to prove that the settlement is unreasonable[.]" *Dick v. Sprint Commc'ns Co. L.P.*, 297 F.R.D. 283, 290 (W.D. Ky. 2014) (quoting *Levell v. Monsanto Research Corp.*, 191 F.R.D. 543, 550 (S.D. Ohio 2000)). None of the objectors carries his or her burden.[7] Because several of the objections overlap in content, Plaintiffs will address them by category below.

### 1. Objections that Class Members should receive "free replacement washers" or "more money" should be overruled.

The vast majority of objectors argue that the Settlement provides too little recovery. (*See* Docs. 220, 222, 223, 225, 227 & 229.) Some objectors ask that their machines be replaced without charge or that they receive a refund of the full amount of money they spent on their washer. (Docs. 222, 223, & 225.) Others do not ask for a specific amount of compensation, but simply state that the Settlement is inadequate. (Doc. 229.) A few objectors suggest that they should receive compensation for emotional distress, personal injuries, or other non-economic damages. (Docs. 220 & 225.)

---

[7] As an initial matter, it should be noted that a few of the docketed objections are untimely. (*See* Docs. 228, 229 & 230.) Others do not comply fully with the requirements to submit a valid objection as set forth in the Class Notice. (*See* Docs. 225, 226, 227, 228 & 230.) Two (2) "objections" (Docs. 218 & 221) were actually inadvertent attempts to obtain claim information, which the undersigned Class Counsel assisted these Class Members with. And one (1) objection (Doc. 224) appears instead to be a request for exclusion from the Settlement.

Plaintiffs are sympathetic to these objections – they, of course, would love to have recovered more for Class Members and devoted nearly a decade fighting to do so. But, they respectfully note that most of these objections should be overruled for the simple reason that they seek relief far in excess of what Class Members could have recovered after a successful trial. While it is understandable that objectors would want to be compensated for the full price of their machines (or more), Plaintiffs could never have achieved that result. Plaintiffs could only recover damages for their economic harm, which is measured by the difference between the price of the washer at the point of sale and the value the washer would have had but-for the alleged defect. (*See* Doc. 114-5.) Plaintiffs could not have recovered the full price for each machine, the full cost to purchase an equivalent washer today, or full replacement of the machines at no cost. As indicated above, Plaintiffs' damages expert estimates that damages were either $226 or $245. (Doc. 114-5 at 29.)

It bears emphasis, moreover, that this litigation did not involve claims for personal injury or emotional distress, and the Settlement expressly excludes such claims. (Settlement Agreement at ¶1.24.) That is, any Class Member with such a claim still has that claim notwithstanding this Settlement. *Fidel v. Farley*, 534 F.3d 508, 512, 515 n.5 (explaining that an individual only has standing to object to a settlement if his or her rights are impacted by that settlement).

Finally, while Plaintiffs note that a few objections ask simply for "a larger settlement" (i.e., these objections arguably do not seek more than Plaintiffs' could have recovered at trial), such objections are misguided. *See, e.g., Linney v. Cellular Alaska P'ship*, 151 F.3d 1234, 1242 (9th Cir. 1998) ("Appellants offer nothing more than

speculation about what damages 'might have been' won had they prevailed at trial . . . .

[But][t]he proposed settlement is not to be judged against a hypothetical or speculative measure of what *might* have been achieved by the negotiators." (emphasis in original)).

When measured against the actual range of outcomes available in this litigation, the Settlement is an exceptional result. *See, e.g., In re Polyurethane Foam Antitrust Litig.*, No. 1:10 MD 2196, 2015 WL 1639269, at *5 (N.D. Ohio Feb. 26, 2015) ("A settlement figure that equates to roughly 18 percent of the best-case-scenario classwide overcharges is an impressive result in view of these possible trial outcomes."), *appeal dismissed* (Dec. 4, 2015); *Stop & Stop Supermarket Co. v. SmithKline Beecham Corp.*, No. 03-cv-4578, 2005 WL 1213926, at *9 (E.D. Pa. May 19, 2005) (11.4% of damages); *In re Linerboard Antitrust Litig.*, No. MDL 1261, 2004 WL 1221350, at *4 (E.D. Pa. June 2, 2004) (collecting cases approving anywhere from 5.35% to 28% of damages).

Critically, the objectors focus on the settlement benefit amounts while ignoring the other half of the analysis mandated by *Bennett* – the risks of Class faced in continuing the litigation.  As detailed herein, those risks are serious and manifold, including pending summary judgment, *Daubert* concerns, certification motions, reversal of class certification by Eleventh Circuit, a defense verdict in nearly identical litigation against a different manufacturer, and lengthy appeals.  (*See supra*, Section III.A.4.)  Especially in light of these risks, the Settlement is an excellent result and worthy of final approval.

Finally, the objectors ignore that this litigation was exceptionally hard fought by competent counsel.  Electrolux rigorously challenged all aspects of the case, and Plaintiffs' claims – and class status – were at risk.  The objectors also ignore that the Settlement was reached after lengthy, repeated negotiations between adversarial counsel.

The result represents the best settlement possible given both the strengths and weaknesses of Plaintiffs' case.

> **2.     Objections that do not go to the fairness of the class Settlement, but rather are grievances about the validity of the claims or about class action lawsuits as a concept, do not counsel against approval.**

Some objectors assert that they have had no problem with their washing machine, that Plaintiffs' claims are not meritorious, and generally disagree with class action lawsuits as a concept. (*See* Docs. 211, 217, 224, 226 & 230.)  Such objections do not undermine the fairness, adequacy, and reasonableness of the Settlement – paradoxically, they weigh in *favor* of approving the Settlement. *True v. Am. Honda Motor Co.*, 749 F. Supp. 2d 1052, 1082 (C.D. Cal. 2010) (noting that Class Members who believe the case has no merit whatsoever must think the settlement is *more* than fair to the class, suggesting it should be approved).  Class Members who oppose this lawsuit on ideological grounds, moreover, were free to exercise their right to opt out of it.  Such objections should be overruled summarily. *See, e.g., In re Motor Fuel Temperature Sales Practices Litig.*, No. 07-MD-1840-KHV, 2012 WL 1415508, at \*16 n.32 (D. Kan. Apr. 24, 2012).  To be sure, the long and hard-fought history of this case for nearly a decade belies the assertion that the underlying claims are without merit.

> **3.     Objections that Class Members should have the option of having Electrolux come to their homes to repair their machine should be overruled.**

Two (2) objectors are dissatisfied with the monetary benefits available to them and believe that the Settlement should include an option of having Electrolux come to their homes to repair their machine.  (*See* Docs. 213 & 228.)  For instance, Objector Gangl (Doc. 213) contends that if Electrolux, at its cost, would come to the customer's

home to replace the washer's rubber collar, the washing machine "would be serviceable as intended." (*Id.*) Of course, if Objector Gangl believes that the monetary benefits are insufficient, he could have opted-out of the Settlement to pursue the relief he desires. Moreover, Objector Gangl offers no proof demonstrating that simply replacing the rubber collar on the machine will necessarily cure any alleged mold defect. The Grasso's engineering expert in this case pointed to several sources of mold development within the machines, including the sump pump and drainage system. (*See* Doc. 114-2 at 34.) Indeed, Objector Warlick complains that he did, in fact, install a replacement rubber collar in his machine and yet the mold problem still persisted. (Doc. 228.)

White it is understandable that some Class Members may desire a permanent fix, no settlement can obtain all relief that any Class Member could conceivably desire. The appropriate test is whether the Settlement is fair and reasonable considering the attendant circumstances. The Settlement here satisfies that standard.

> **4.    Objections that Class Members should be reimbursed for out-of-pocket expenses that have not yet been incurred or that cannot be supported by documented proof should be overruled.**

Three (3) objections suggest that Class Members should be paid for out-of-pocket expenses that have not yet been incurred (Docs. 225 & 227) or that cannot be supported by documentary proof (Doc. 213). For example, Objector Wisuri considers the $50 cash benefit a "slap in the face" and requests payment from Electrolux of $500, regardless of whether replacement costs have been incurred/paid by the consumer or not. (Doc. 227.) This is essentially an objection for "more money," and for the reasons previously stated, should be overruled. And while Class Members who seek out-of-pocket expenses (up to $500) must substantiate such claims with proof of the expenditure, that burden is minimal

28

in light of the extremely significant relief.  *See, e.g., Schulte v. Fifth third Bank*, 805 F.

Supp. 2d 560, 591-94 (N.D. Ill. 2011); *see also* NEWBERG ON CLASS ACTIONS §12:21 (5th

ed.) (explaining that substantiation may be required "to enable class counsel or the

settlement administrator to determine if the claimant is a member of the certified

settlement class, and where appropriate, the amount to which the claimant is entitled").

The minimal proof requirement "strike[s] a proper balance between, on the one hand,

avoiding fraudulent claims and keeping administrative costs low, and on the other hand,

allowing as many class members as possible to claim benefits."  *In re Lawnmower*

*Engine Horsepower Mktg. & Sales Practices Litig.*, 733 F. Supp. 2d 997, 1010 (E.D.

Wis. 2010).

   To be sure, if a class member went to trial, she would have to establish a valid

claim by showing both proof of ownership of a Class Washer and also proof of damages.

It is unfortunate that some Class Members may have spent money on repair or

replacement due to mold problems, but cannot now claim reimbursement because they

did not retain receipts.   Those Class Members remain eligible for other types of

settlement benefits, however, and the objectors offer no viable alternative regarding how

the Settlement Administrator could prevent fraudulent reimbursement claims without the

documented proof requirement for reimbursement of repair/replace expenses.

Ultimately, the claim documentation requirements are not only reasonable, but necessary.

   **5.**  **The one objection containing a sentence that could conceivably**
     **be construed as pertaining to the attorneys' fees and costs**
     **request should be overruled.**

   Notably, the vast majority of objections do not reference, much less challenge, the

attorneys' fees and costs award requested in this case.  The one (1) objection containing a

sentence that could conceivably be construed as pertaining to the attorneys' fees and costs request comes from Objector Guthrie. (Doc. 217.) Objector Guthrie erroneously contends that "only owners of washing machines with mold/odor issues are eligible for recovery," and proclaims, without any supporting basis, his "belief" that "the number of actual aggrieved parties is very small, and opportunity for recover is quite limited." *Id.* According to Objector Guthrie, any attorneys' fees and costs will "dwarf any economic benefit to the actual members of the Class." *Id.*

Objector Guthrie's lack of supporting basis notwithstanding, his premise is mistaken: *all* washing machine owners are eligible for recovery, even those who never experienced a mold, mildew or odor issue. The substantial benefits made available to hundreds of thousands of consumers across the country, whether they were aggrieved or not, provides a significant and meaningful economic benefit to Class Members, as previously discussed. Moreover, as discussed in Class Counsels' Motion for Award of Attorneys' Fees and Costs (Doc. 216), the requested fees are well-justified in light of the result obtained for the Class, and in light of Class Counsels' actual lodestar incurred in this litigation.

## IV. LOCAL RULE 3.01(g) CERTIFICATION

Prior to filing this motion, counsel for Plaintiffs conferred with defense counsel regarding the relief requested in this motion. Although it does not agree with certain arguments and representations contained in Plaintiffs' motion, Electrolux does not oppose the relief sought by Plaintiffs' motion.

## V. **CONCLUSION**

For the foregoing reasons, Plaintiffs respectfully request that the Court enter a Final Order and Judgment Certifying the Class, approving the Class Settlement, and dismissing the action with prejudice.

Dated:  March 16, 2018

Respectfully submitted,


/s/ R. Brent Irby
R. Brent Irby, *pro hac vice*
McCALLUM, HOAGLUND, COOK &
      IRBY, LLP
905 Montgomery Highway
Suite 201
Vestavia Hills, Alabama  35216
Telephone:  (205) 824-7767
Facsimile:  (205) 824-7768
birby@mhcilaw.com

Edward A. Wallace, *pro hac vice*
Tyler J. Story, *pro hac vice*
WEXLER WALLACE LLP
55 West Monroe Street, Suite 3300
Chicago, Illinois  60603
Telephone:  (312) 346-2222
Facsimile:  (312) 346-0022
eaw@wexlerwallace.com
tjs@wexlerwallace.com

Gregory F. Coleman, *pro hac vice*
Adam Edwards, *pro hac vice*
Greg Coleman Law PC
      First Tennessee Plaza
800 S. Gay Street, Suite 1100
Knoxville, Tennessee  37929
Telephone: (865) 247-0080
greg@gregcolemanlaw.com
adam@gregcolemanlaw.com

John A. Yanchunis
Florida Bar No. 324681
Patrick A. Barthle
Florida Bar No. 99286
Marisa K. Glassman
Florida Bar No. 111991
MORGAN & MORGAN
COMPLEX LITIGATION GROUP
201 N. Franklin Street, 7th Floor
Tampa, Florida 33602
Telephone: (813) 223-5505
Facsimile: (813) 233-5402
jyanchunis@forthepeople.com
pbarthle@forthepeople.com
mglassman@forthepeople.com

*Attorneys for Plaintiffs and the Putative
Class*

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on March 16, 2018 a true and correct copy of the foregoing was electronically filed with the Clerk of the Court by using the CM/ECF system, which will send a notice of electronic filing to counsel of record for parties in the case.

Richard T. Bernardo
Christopher Cox
SKADDEN, ARPS, SLATE, MEAGHER & FLOM, LLP
4 Times Square
New York, NY 10036
Telephone: 212-735-2603
Email: christopher.cox@skadden.com
        Richard.bernardo@skadden.com

John H. Beisner
Jessica D. Miller
SKADDEN, ARPS, SLATE, MEAGHER & FLOM, LLP
1440 New York Avenue, NW
Washington, DC 20005
Telephone: 202-371-7000
Facsimile: 202-661-8301
Email: john.beisner@skadden.com
        jessica.miller@skadden.com

R. Craig Mayfield
BRADLEY, ARANT, BOULT CUMMINGS LLP
100 N. Tampa Street
Suite 2200
Tampa, Florida 33602
Telephone: 813-559-5500
Facsimile: 813-229-5946
Email: cmayfield@bradley.com

                                        /s/ R. Brent Irby_____
                                        COUNSEL